## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| Advanced Control Technology, Inc., | ) | |
| Plaintiff, | ) | Case No.: _____ |
| | ) | |
| v. | ) | |
| | ) | |
| Steven Iverson; John Iverson; and Elite IBS, LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## PLAINTIFF ADVANCE CONTROL TECHNOLOGY, INC.'S COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

Plaintiff, Advanced Control Technology, Inc. ("ACT" or "Plaintiff"), by and through its undersigned attorneys, Bowman and Brooke LLP, for its complaint against Steven Iverson, John Iverson, and Elite IBS LLC ("Defendants"), states and alleges with knowledge regarding its own actions, and otherwise upon information and belief following an investigation reasonable under the circumstance, as follows:

## NATURE OF THE ACTION

1.     This action arises from Defendants' willful and malicious theft and misappropriation of ACT's trade secrets and confidential and proprietary information.

2.     Defendants now threaten significant harm to ACT and ACT's business in malicious ways by threatening the security of ACT's most confidential information, the wrongful dissemination of which would result in ACT's closure as a business and a loss of its clients.

3.     ACT brings this action to prevent Defendants from their ongoing extortion and wrongful possession of ACT's confidential and proprietary information and trade secrets to

damage ACT's business, business relationships, and competitive advantage in a small and competitive industry.

## **PARTIES**

4.      Plaintiff, Advanced Control Technology, Inc., a Minnesota company, is domiciled at 7050 County Road 101 East, Shakopee, Minnesota 55379.

5.      Defendant Steven Joseph Iversen is an individual who resides at 1020 West Medicine Lake Drive Apt. 141, Plymouth, Minnesota 55441 and is a citizen of the state of Minnesota.

6.      Defendant John Iverson is an individual who resides at 9210 45th Avenue North, Minneapolis, Minnesota 55428 and is a citizen of the state of Minnesota.

7.      Defendant Elite IBS, LLC, which may also do business as Elite Industrial Business Solutions, LLC, is a limited liability company doing business in Minnesota and is domiciled at 1020 West Medicine Lake Drive, Suite 141, Plymouth, MN 55441.  At least one of Defendant Elite IBS, LLC's members is a citizen of Minnesota.

## **JURISDICTION AND VENUE**

8.      This Court possesses federal question jurisdiction based on 28 U.S.C. § 1331 because this action alleges violations of federal statutes, including the Defend Trade Secrets Act ("DTSA"). *See* 18 U.S.C. § 1836(c) ("The district courts of the United States shall have original jurisdiction of civil actions brought under this section."). Federal question jurisdiction under 28 U.S.C. § 1331 is also appropriate because this action alleges violations of the Computer Fraud and Abuse Act. *See* 18 U.S.C. § 1030. This Court possesses supplemental jurisdiction over the remaining claims pursuant to 28 U.S.C. § 1367.

9.      All conditions precedent for jurisdiction pursuant to the DTSA are satisfied. ACT engages in interstate commerce and has clients throughout the country, including in the state of Wisconsin. Defendants' malicious misappropriation of trade secrets and computer fraud and abuse involved client information and materials from clients outside of the state of Minnesota, and those trade secrets directly relate to products and services used in interstate commerce.

10.     This Court possesses personal jurisdiction over all Defendants because all Defendants reside within, and are citizens of, the state of Minnesota, and can be served with process in Minnesota.

11.     The Court also possesses jurisdiction over all parties because a majority of the facts relevant to this dispute occurred in Minnesota.

12.     Venue is proper in this Court based on 28 U.S.C. § 1391(b)(2). As alleged herein, a substantial part of the events giving rise to the claims occurred in Minnesota. Plaintiff incorporates by reference the facts and allegations contained herein as factual support for Plaintiff's claim for venue.

## FACTS

**A.      Introduction to ACT.**

13.     ACT is a local, family-owned business headquartered in Shakopee, Minnesota that manufactures high-quality float switches and liquid-level sensors for a number of industries and customers including, for example, for the aerospace industry, the U.S. government, bulk-storage tanks, chemical-dispensing systems, the commercial restaurant industry, and truck and car wash lines.

3

14.     ACT's business model is unique because all ACT parts are produced in-house by ACT employees who bring craftsmanship and skill to the production process.  Each ACT engineer possesses ten or more years of liquid-level sensor experience.

15.     The ACT production facility houses injection-molding machines, mix-and-dispensing equipment, ultrasonic welding, automated wire termination, CNC lathes, electronic assembly, testing and an array of specialty equipment to produce the highest quality components possible.

16.     One reason ACT is unique from its business competitors is because it has complete vertical integration of its product line and incorporates its own unique production and design model.

17.     ACT also has a separate, in-house sales department, through which sales employees interface directly with customers to accommodate efficient ordering, production, and deliveries.

18.     These differences, along with a multitude of other processes, keeps ACT competitive on the national stage in a very competitive industry.

**B.     Defendant Steven Iverson's Working Relationship with ACT.**

19.     Defendant Steven Iverson was a salesman who began working for ACT on or around November 10, 2008.

20.     While Steven Iverson worked for ACT, he was based in the sales department at the ACT headquarters in Shakopee, Minnesota.

21.     Steven Iverson had various titles while at ACT, including Business Development/Operations Manager. In these roles, and especially in his senior, managerial

role as Business Development/Operations Manager , Steve Iverson was trusted by ACT, and

provided access to many of ACTS trade secrets as well as its most confidential information

and documents, and was specifically authorized to use them for ACT's benefit during the

period of the relationship between ACT and himself.

**C.   ACT's Confidentiality Policies and Protection of its Property.**

22.    At the time Defendant Steve Iverson was hired by ACT, he was provided

safety and policy manuals that are required by everyone that works for ACT to be read and

acknowledged before beginning their first day of work.

23.    The ACT Policy Manual contains a "Work Ethics" section that provides, in

relevant part, as follows:

**Protecting Company Information.**
- Protecting our company's information is the responsibility of every team member.
- Information includes but is not limited to:
  - Customer lists
  - Manufacturing process data
  - Pricing
  - Company operations
  - Vendor lists
  - Specifications
- If you are aware or suspicious of possible company information leaving the premises, alert someone immediately, do not wait until the information has been taken.
- We all share a common interest in making sure confidential information is not improperly or accidentally disclosed.
- Discussions of company confidential business with anyone who does not work directly for the company is prohibited.
- No confidential information of any kind is to be removed or sent physically or electronically in any form from the company.
- Transfer of confidential information, electronically, hard copies or other means to anyone out side the company is prohibited.
- Destruction of confidential information is prohibited.

- Any confidential information is used in any manner which causes any loss to ACT, the costs to recovery, acquire new, loss of income, legal fees, will be your responsibility.
- Any confidential information destroyed, which causes any loss to ACT, the costs for recovery new information, loss of income, legal fees, will be your responsibility.
- All persons with knowledge of or involved with transferring, coping, destruction or theft of, will also be responsible for all losses and additional costs to recover or replace these materials.
- These actions directly affect your future and the profit of the ACT.

**Theft**
- The removal of any item without prior approval will result in immediate discharge.
- The cost to replace these items will be deducted from your paycheck.
- You will be responsible to cover the cost to replace items and all costs incurred by ACT which include, hire or rent temporary means because of theft of item, legal fees, loss of business and other costs that may occur for not having the item.

24.     The ACT Policy Manual contains a "Non-Compete Clause," which states as

follows:

- Upon leaving your employment here you are restricted for a period of one year:
    - o  Take a position with a competitor.
    - o  Become a consultant with a competitor.
    - o  Take an ownership position with or as a competitor.
    - o  Supply a competitor with confidential or proprietary company information in any form.

- Companies that produce, manufacture, distribute, promote, or sell liquid level, temperature, pressure and position sensors and controls are competitors.
- Sales representatives, agents, wholesalers, distributors of liquid level, temperature, pressure and position sensors and controls are competitors.
- You will be held responsible for all losses caused by and costs to recover or replace, loss of business revenues, competitive advantage, proprietary information, workers unemployment compensation, plus all additional losses and costs incurred.

25.     During the relationship between ACT and Defendant Steven Iverson, and after the relationship terminated, Defendant Steven Iverson was bound by the policies and procedures contained in the ACT Policy Manual.

26.     During the relationship between ACT and Defendant Steven Iverson, Mr. Iverson was also responsible for protecting ACT's trade secrets and confidential information and knew the importance ACT placed on protecting its trade secrets and confidential information.

27.     For example, while Defendant Steven Iverson worked with ACT, he was responsible for requesting on January 9, 2017 that ACT  review and execute a mutual non-disclosure agreement with ACT client (AGCO Corporation, (AGCO) 202 Industrial Park, Jackson MN 56143) before a formal business relationship was initiated.

28.     The AGCO mutual non-disclosure agreements, which Defendant Steven Iverson ensured was signed by both ACT and its client, contained the following information concerning the type of "Confidential Information" that was to be protected:

"Confidential Information" means any information disclosed previously or in the future by a Disclosing Party to a Receiving Party, either directly or indirectly, in writing, orally or by inspection of tangible objects (including without limitation documents, business plans, part numbers, source code, software, documentation. financial analyses, marketing plans, customer names, customer lists, customer data, product plans, products, services, inventions, processes, designs, drawings, engineering or hardware configuration information, know-how, trade secrets or any other proprietary or business information), which is designated as "Confidential", "Proprietary" or some similar designation, is protectable as a trade secret under the provisions of the Uniform Trade Secrets Act, or whose confidential or proprietary nature is reasonably apparent under the circumstances. Confidential Information shall also include information disclosed to the Disclosing Party by third parties pursuant to a nondisclosure obligation.

29.     These mutual non-disclosure agreements restricted the customer's and ACT's use of Confidential Information, for example, as follows:

> 3. **Non-Disclosure and Non-Use.** A Receiving Party shall not disclose any Confidential Information of the Disclosing Party to third parties. A Receiving Party may disclose Confidential Information to those of its and its affiliates' officers, directors and employees ("Representatives") who are required to have the Confidential Information to accomplish the Purpose. Receiving Party will cause its and its affiliates' Representatives to maintain the confidentiality of the Confidential Information and will be responsible for any disclosure of Confidential Information by its or its affiliates Representatives. A Receiving Party shall not use any Confidential Information of the Disclosing Party for any purpose other than the Purpose.

30.     The mutual non-disclosure agreements that Defendant Steven Iverson implemented with ACT's customers requires those customers and ACT to "take reasonable measures to protect the secrecy of and avoid disclosure and unauthorized use of the Confidential Information," as well as to ensure that their respective Representatives with access to Confidential Information have signed a confidentiality agreement or are otherwise bound by confidentiality obligations.

31.     Defendant Steven Iverson was, therefore, personally aware of his confidentiality obligations owed to both ACT and its customer as a Representative of ACT.

32.     ACT also protects its trade secrets and confidential information through other various means.

33.     For example, no office workers, including sales people like Defendant Steven Iverson, are allowed into the device assembly area, and vice versa.

34.     This policy ensures that none of ACT's confidential pricing and customer information is ever commingled with assembly and manufacturing information, and

safeguards that information by maintaining it in silos where only the people who need access

to it for proper, authorized business purposes, are provided such access.

35.     ACT employees sometimes noticed Defendant Steven Iverson in the assembly

area before anyone in the office arrived for the work day, in violation of ACT's policy.

36.     ACT counseled Defendant Steven Iverson that such conduct was prohibited

and violated company policy.

37.     ACT also maintains a physical barrier between the assembly areas and the

sales area where Defendant Steven Iverson and the other sales staff worked.

38.     ACT further protected its property by maintaining password protection on its

management teams' computers. These passwords were not shared amongst the staff and were

never given out to anyone.

39.     Additionally, ACT maintained three different IT networks to hinder

unauthorized access to its information: a private network accessed by ACT's President, Tim

Walsh; the accounting/ordering network; and the sales' staff network.

40.     To protect its trade secrets and confidential information, ACT also prohibits

personal use of any of its computers at any time by any workers.

41.     As a trusted ACT salesperson with frequent client contact, Defendant Steven

Iverson was provided access to a tremendous amount of ACT confidential information that

constituted the life-blood of the company, including but not limited to, current customer lists,

proprietary manufacturing process data, competitive pricing and pricing strategy, customer

quotes, company operations, vendor lists, and product specifications.

42.     As an ACT salesperson, Defendant Steven Iverson possessed knowledge of all of Act's security policies and procedures and the importance of them to ACT.

43.     Pursuant to the confidentiality obligations contained in the ACT Policy Manual, as well as the confidentiality provisions contained in the non-disclosure agreements between ACT and its customers, Defendant Steven Iverson possessed a duty to protect ACT's property, including proprietary, confidential information and trade secrets, to use ACT property only for ACT-related purposes. Further Defendant Steve Iverson also owed ACT a duty of care to return all ACT property back to ACT upon his discharge.

**D.     Defendant Steven Iverson is Discharged from ACT, and Refuses to Return ACT Property.**

44.     On May 20, 2019, ACT determined that it would end its working relationship with Defendant Steven Iverson due to performance-related issues.

45.     Tim Walsh, President of ACT, along with Kathy Walsh and Amy Collette, who are both Vice-Presidents of ACT, met with Defendant Steven Iverson on the morning of May 20, 2019 to inform Mr. Iverson of ACT's decision and to escort him from the property.

46.     During that May 20, 2019 meeting, Defendant Steven Iverson threatened these ACT officers by saying that they did not need to watch him clean out his desk because he already had everything of the company's that he wanted.

47.     At 3:08 p.m. on that same day, Defendant Steven Iverson sent ACT an email communication from his personal email account that had attached to it a purchase order directed to ACT from a current ACT customer located in a sales territory (*i.e.*, Wisconsin) in which Steven Iverson had not been assigned. Defendant Steven Iverson had no reason to

possess either this email or the purchase order, and he was instructed by ACT to delete all ACT Confidential Information from his personal email accounts and devices immediately.

48.     Defendant Steven Iverson, however, refused to remove and destroy ACT's property from his personal possession, and instead again threatened to share ACT's Confidential Information with its competitors.

49.     Defendant Steven Iverson also directly threatened ACT's business by stating to CEO Tim Wash that "ACT is about a dozen major accounts away from not even existing anymore."

50.     Defendant Steven Iverson also admitted that he has "quite a few of [ACT's] emails from Wisconsin companies."

51.     These direct threats to ACT's business were extraordinarily troubling to the ACT officers and resulted in them conducting a review and assessment of Defendant's Steven Iverson's ACT email and computer activity.

52.     ACT subsequently learned that Defendant Steven Iverson had been systematically sending and/or copying to his personal email accounts all of the emails he received and sent from his ACT work email address since 2015 before his termination. These emails contained, for example, a host of confidential, proprietary and trade secret information including, but not limited to, customer information about customers that Defendant Steven Iverson serviced and those he did not, including information about specific confidential orders for the customers and pricing strategies for those customers; specifically engineered blueprints of ACT products for particular customers and those customers' specific needs; customer orders and details about specific customers and their respective

confidential and proprietary customer-related pricing and strategies; pricing information and competitive pricing strategies used by ACT to remain competitive; and confidential customer quotes, including for private and governmental entities, which includes a description of ACT's confidential services, processes, and pricing strategies—all of which constitutes ACT property that it considers to be its trade secrets and confidential and proprietary information (collectively, the "ACT Trade Secrets").

53.   As of the date of this Complaint, Defendant Steven Iverson wrongfully still possesses the ACT Trade Secrets, confidential information, and other non-trade secret documents and materials that belong to ACT.

54.   Defendant Steven Iverson took this information by sending all of his ACT-related emails from his ACT email address (stevei@actsensors.com) to an email address that at first glance resembled his ACT email address (stevei.actsensors.com@aol.com).

55.   Defendant Steven Iverson had no authority to send ACT Trade Secrets to this account.  It violated company policies that were well-known to him.

56.   Defendant Steven Iverson also sent ACT emails containing ACT Trade Secrets and other confidential information to the following email accounts, that upon information and belief, are owned and operated by himself: stevei@eliteibs.com; steveiversen@gmail.com; and ivers002@aol.com.

57.   Defendant Steven Iverson had no authority to send the ACT Trade Secrets and other confidential ACT information to those accounts. Again, such actions violated ACT company policies that were well-known to Defendant Steven Iverson.

58.     The actions of Defendant Steven Iverson described above were intentional acts of subterfuge meant to deceive and hide Defendant Steven Iverson's theft and unlawful activity and misappropriation.

59.     Defendant Steven Iverson has acknowledged that he possesses ACT information on his personal computer, but contends that such information now belongs to him.

60.     At no point in time did ACT authorize Defendant Steven Iverson's continued possession and misappropriation of ACT's property or the ACT Trade Secrets past the date of termination of the relationship between the parties.

61.     Through its review, ACT also discovered that a password-recovery tool called Google Password Decryptor had been downloaded and installed against ACT policy on the ACT computer that Defendant Steven Iverson was using.

62.     On that computer's hard drive, ACT located a document entitled "Chrome Password Recovery Report" with username and password credentials belonging to Defendant Steven Iverson, Tim Walsh, and Kathy Walsh, in addition to others, for the purpose of gaining access to their respective accounts on numerous websites.

63.     At no point in time did Tim Walsh or Kathy Walsh provide their passwords to Defendant Steven Iverson.

64.     The highly confidential credentials belonging to Tim Walsh pertain to accessing vendor accounts, AT&T, eBay, Amazon, a distillery permit and mandatory reports made to the Alcohol and Tobacco Tax and Trade Bureau, and ACT's Zone alarm extreme security software online.

65.    ACT is currently still investigating the extent of Defendant Steven Iverson's wrongfully accessing of ACT's protected environments outside the scope of his authority.

66.    The highly confidential credentials belonging to Kathy Wash pertain to accessing vendor and Government accounts online.

67.    Defendant Steven Iverson did not have permission to access any of the accounts belonging to either Tim Walsh or Kathy Walsh.

68.    None of these sites would have been accessed by either Tim or Kathy Walsh at any time on the ACT computer used by Defendant Steven Iverson, and neither ACT nor the Walsh's know how Defendant Steven Iverson was able to obtain their private online account credentials, unless it was through the use of stealth, deceit and/or trickery and other means outside the scope of Defendant Steven Iverson's authority.

69.    On May 23, 2019, at 7:54 a.m., the U.S. Department of Defense sent Kathy Walsh an "Account Security Alert" to the only authorized email address authorized to access the site.

70.    Mrs. Walsh was not attempting to access her Department of Defense account at that time, and the only other individual known to have had her credentials is Defendant Steven Iverson, albeit unlawfully and without her permission.

71.    Upon information and belief, Defendant Steven Iverson accessed Mrs. Walsh's Department of Defense account for illicit and unlawful purposes and with no authorization from anyone at ACT to authorize this account.

72.    On or around May 23, 2019, ACT, through counsel, demanded that Defendant Steven Iverson return all ACT property in his possession. He refused to do so.

73.     On May 24, 2019, Defendant Steven Iverson emailed ACT's officers and again acknowledged there was ACT property on his personal electronic devices, stating "[a]nything I had on my computer was also sent to ACT Sensors email or forwarded to ACT by me… anything on my computer is on a computer at ACT. I withheld nothing. The information on my computer is mine."

74.     ACT also learned through its extensive and ongoing review of Defendant Steven Iverson's ACT email account that in January and February, 2015, Defendant Steven Iverson had been in contact with two Chinese companies about manufacturing float-level and boiler-temperature sensors.  Such contacts were not for purposes of facilitating ACT's business, were unauthorized byACT, and appear to have been done by Defendant Steven Iverson's solely for his personal interests.

75.     These Chinese companies are Shenzhen Sunwoald Electronics Co., Ltd. ("Sunwoald") and Shenzhen Smart Bes Co., Ltd.

76.     Defendant Steven Iverson communicated with representatives from these companies through both his private email address (steveiversen@gmail.com) and his ACT email address to order samples and request price quotes.

77.     Both Chinese companies repeatedly requested specifications and CAD drawings of the sensors that Defendant Steven Iverson  wanted them to manufacture, and he even offered to send Sunwoald drawings for the specific requirements and pointed the Sunwoald sales representatives to ACT's website (www.actsensors.com) for "an idea of what they are."

78.    Defendant Steven Iverson wrote to Sunwoald that, "[i]f they work well, we will purchase many thousands per year."

79.    Defendant Steven Iverson did not have authority to provide any of ACT's confidential drawings, which it considers to be trade secrets, to these companies in China, as doing so creates an extremely high risk of trade secret theft by Chinese companies, which is unfortunately very common in the manufacturing industry.

80.    Defendant Steven Iverson did not have the Chinese companies sign any type of protective agreement and did not consult with any other ACT employees about how to protect ACT's confidential and trade secret information from misappropriation or theft by the Chinese companies.

81.    ACT believes that Defendant Steven Iverson made good on his promises and that he provided ACT's drawings to these Chinese companies for the purpose of directly competing with ACT in violation of his fiduciary duties and the "Non-Compete Provision" contained in the ACT Policy Manual.

82.    ACT notified and filed reports with numerous law enforcement agencies, including the Shakopee Police Department, the Federal Bureau of Investigation, and the U.S. Department of Defense, all of which are still investigating this matter.

83.    Extremely concerned with ACT's findings and desperate to keep Defendant Steven Iverson from destroying ACT, on May 31, 2019, Tim Walsh communicated with Defendant Steven Iverson and offered to pay Defendant Steven Iverson money to keep the ACT information in his possession out of the hands of competitors.

84.     The repeated threatened disclosure of the ACT Trade Secrets and confidential information by Defendant Steven Iverson would cripple ACT and perhaps cause ACT to close.

85.     Defendant Steven Iverson again refused, and instead requested that Tim Walsh make him an offer to hire him back to work at ACT.

86.     This request was not responded to as ACT did not want Defendant Steven Iverson to come to work for it again in light of all ACT had recently learned about Defendant Steve Iverson.

87.     On June 4, 2019, Defendant Steven Iverson followed up with Tim Walsh and instead extended his own offer to come back to work for ACT, writing in part as follows:

> I have not used any of my knowledge whether on my computer [or] in my head for any competitive reason.… I even turned down (again) an opportunity that would utilize my knowledge at a competitor. I don't know if it is due to residual loyalty - or foolishness on my part. Last week I received approximately 13 text messages asking and pleading with me to agree to continue getting paid. I was disappointed that you thought I might take money for doing nothing. I would like to make one last attempt to come to a civil solution. If you would like and are amenable to it, I would work less than full time, officed remotely. I would call on anyone you wanted me to call on and you could screen the emails before I see them and pass along only what you want. I will agree to a very strict Non-compete and/or non-disclosure - so long as it had a 90-day written notice. After 6 months, I would agree to 60-day notice and after a year, a 30-day notice would be acceptable. The reason for the notice period, is I would not want to sign an agreement and then have it canceled immediately or without notice if someone became angry. I am not asking for anything. I am just making an offer to work (remotely), less than full time calling on anyone that ACT chooses, in case you have any interest. It would save the company money and it would be a legitimate client/contractor relationship. I have tried vey hard to keep [t]his situation civil and professional.

88.     Thus, Defendant Steven Iverson was trying to leverage the ACT property and Confidential Information in his possession, which he refused to destroy and/or return, to negotiate and extort from ACT more favorable working conditions and terms of a new business relationship with ACT.

89.     ACT refused to accede to Defendant Steven Iverson's demands, and on June 12, 2019, he wrote to ACT that he "will no longer keep anything secret."

90.     All of the aforementioned conduct demonstrates that Defendant Steven Iverson understood that the information he transmitted outside of ACT did not belong to him, otherwise there would be no reason to surreptitiously send the information to personal email addresses.

91.     This pattern of behavior also demonstrates that Defendant Steven Iverson knew that his threats against ACT were viable and that his disclosure of the ACT Trade Secrets and confidential information would cripple ACT and serve to harm ACT in an unquantifiable manner.

**E.      Defendant Elite IBS, LLC Unlawfully Possesses ACT's Property.**

92.     While Steven Iverson worked with ACT he separately operated a limited liability company called Elite IBS, LLC.  Upon information and belief, this same company also operates under the name Elite Industrial Business Solutions.

93.     Upon information and belief, that company provides flow gaskets and labor related to installing those gaskets, and did not previously compete with ACT.

94.     ACT has recently discovered that Defendant Steven Iverson conducted business on behalf of Elite IBS, LLC utilizing his ACT work email address (stevei@actsensors.com), in violation of company policy.

95.     Further, Defendant Steven Iverson sent ACT emails containing ACT's property, trade secrets, and Confidential Information to an email account owned and operated by Elite IBS, LLC (stevei@eliteibs.com).

96.     Upon information and belief, Defendant Elite IBS, LLC is in possession of, and has also misappropriated the ACT Trade Secrets and other property, materials, and information.

**F.      Defendant John Iverson Unlawfully Possesses ACT's Property.**

97.     Upon conducting its review of Defendant Steven Iverson's ACT email address activity, ACT learned that Defendant Steven Iverson also forwarded ACT Confidential Information and property to his son, Defendant John Iverson, in violation of the ACT Policy Manual and multiple nondisclosure agreements with its customers.

98.     Specifically, ACT discovered that Defendant Steven Iverson had emailed himself and Defendant John Iverson confidential information including but not limited to current customer lists, a full history of each customer, complete customer contact information, along with confidential and proprietary ACT internal part numbering guides and drawings, price lists for ACT customers, including price lists for Government agency parts, and ACT's proprietary pricing strategies.

99.     ACT also believes that Defendant Steven Iverson transmitted this information to Defendant John Iverson by using the Google Docs application.

100.    ACT made a demand to Defendant Steven Iverson that the information transmitted to Defendant John Iverson likewise be returned and destroyed, but Defendant Steven Iverson refused, responding that ACT was threatening his family and he would get his family lawyer involved.

101.    Defendant Steven Iverson confirmed to ACT's counsel that he had provided the ACT Trade Secrets to Defendant John Iverson, stating: "All John did was type some email addresses from handwritten email addresses from the outbound callers so I could send them information…."

102.    At no point did ACT provide authorization to Defendant Steven Iverson to transmit the ACT Trade Secrets and other property and materials to Defendant John Iverson.

103.    Defendant John Iverson never had any authority to possess ACT's property and materials, including the ACT Trade Secrets.

104.    Defendant John Iverson has never signed any protective agreement with ACT and ACT never authorized the transmittal of the ACT Trade Secrets or any information whatsoever to Defendant John Iverson.

## CAUSES OF ACTION

### COUNT ONE

Misappropriation of ACT's Trade Secrets Pursuant to the Federal Defend Trade Secrets Act, 18 U.S.C. § 1831 *et al*. Against All Defendants

105.    Plaintiff adopts and incorporates by reference the allegations set forth in the preceding paragraphs above as if completely and fully set forth herein.

106.    ACT's trade secrets and confidential information are used in ACT's interstate and foreign commerce and communication.

107.    Defendants wrongfully obtained and retained ACT's trade secrets as defined by the DTSA, 18 U.S.C. § 1839(3), including, but not limited to: customer lists containing customer contact information, histories of ACT's customer relationships and orders, blueprints and drawings of ACT products, pricing information and lists, vendor lists, product specifications, and customer quotes.

108.    This information is not common knowledge to anyone outside of ACT. It is highly valuable to ACT and would provide ACT's competitors with an unfair competitive advantage. Defendants know this would substantially harm ACT and has explicitly (and repeatedly) threatened to expose ACT's trade secrets in an attempt to harm ACT.

109.    Not only would it take a considerable amount of time, effort, and expense to duplicate this information without access to ACT's Trade Secrets (and the ability to duplicate this exact information is expressly denied by ACT), but the exposure of this information to the public and to ACT's competitors would destroy ACT's business.

110.    ACT's business advantage and value that it has earned through development of its trade secrets would be lost if the confidential information and trade secrets misappropriated by Defendants became known to ACT's competitors.

111.    ACT has made considerable efforts to prevent disclosure of its confidential and trade secret information, including by clearly defining the nature and purpose of "Confidential Information" in ACT's Policy Manual, physically restricting access between the manufacturing and sales/office operations within the company, password-protecting owners computers, entering into non-disclosure agreements to protect its own and its clients'

sensitive and confidential material, and operating its business IT network on three separate networks which employees were provided access to on a need-to-know basis.

112.    Defendant Steven Iverson had a duty and agreed to keep ACT's confidential information and trade secrets intact and not to use, exploit, or disclose such information other than for ACT's benefit.

113.    Defendants have wrongfully and knowingly acquired ACT's trade secrets. Defendant Steven Iverson wrongfully, and outside of any authority granted by ACT, currently possesses ACT's valuable trade secrets and has maliciously threatened to expose them to ACT's detriment.

114.    Defendant Steven Iverson also wrongfully and maliciously misappropriated ACT's trade secrets when he, without authorization, transmitted ACT's confidential and trade secret information to Defendants John Iverson and Elite IBS, LLC via email and the Google Docs application.

115.    Defendants John Iverson and Elite IBS, LLC received ACT's trade secret and confidential information via email and the Google Docs application from Defendant Steven Iverson. Defendants John Iverson and Elite IBS, LLC had no authority to receive this information and knew they had no authorization to receive and/or possess such information.

116.    Upon information and belief, Defendant Steven Iverson previously provided its trade secrets and confidential information, including but not limited to specifications and drawings of certain ACT float-level and boiler-temperature sensors, to two Chinese companies, for the purpose of secretly manufacturing his own sensors to unlawfully compete with ACT.

22

117.    Despite his duty of secrecy and of loyalty to ACT, Defendant Steven Iverson willfully and maliciously acted contrary to that duty when he not only refused to return ACT's trade secrets, but also to expose them to ACT's detriment.

118.    With wrongful and willful possession of ACT's trade secrets, Defendants now threaten to willfully and knowingly expose the ACT Trade Secrets in violation of their duty of secrecy and with the express purpose of harming ACT.

119.    Defendants' acts were committed knowingly, willfully, maliciously, and in conscious disregard of ACT's rights. Accordingly, ACT is entitled to recover actual and exemplary damages as well as attorneys' fees, in an amount to be determined at trial.

120.    ACT is also entitled to injunctive relief against all Defendants pursuant to 18 U.S.C. § 1836(3)(A).

## COUNT TWO

Civil Theft Against All Defendants Pursuant to Minn. Stat. § 604.14

121.     Plaintiff adopts and incorporates by reference all allegations set forth in the preceding paragraphs as if completely and fully set forth herein.

122.    ACT has ownership of and right of immediate and exclusive possession of ACT's property, including but not limited to customer, vendor, employee lists, engineering specifications, client specifications, customer and ACT financial and business information, and documents and materials related to ACT's business and client relationships, including that information which is not considered trade secret pursuant to the law.

123.    Defendant Steven Iverson had access to and use of said materials during the scope and course of his relationship with ACT.

23

124.    Defendant Steven Iverson's right to access this material ceased at the conclusion of the relationship between the parties.

125.    Defendant Steven Iverson wrongfully obtained this information and materials from Plaintiff. Defendant Steven Iverson does not have any legal right to possession of this information.

126.    Since the termination of the business relationship between ACT and Steven Iverson, Steven has retained this information and materials without any authorization.

127.    Defendant Elite IBS, LLC has never been granted access to or received permission to possess any of ACT's property, and any possession or control of ACT's property by Defendant Elite IBS, LLC is wrongful and not authorized by ACT.

128.    Defendant John Iverson has never been granted access to or received permission to possess any of ACT's property, and any possession or control of ACT's property by Defendant John Iverson is also wrongful and not authorized by ACT.

129.    Defendants' wrongful retention and possession of ACT's property has been done with the specific intent to permanently deprive ACT of the benefit of its own property.

130.    Defendants have knowingly retained and exercised control over ACT's property without authorization with the intent to permanently deprive ACT of the use and the benefit of ACT's property.

131.    ACT has demanded the return of such property. The property has not been returned.

132.    As a direct result of Defendants' wrongdoing, ACT has been damaged in an amount to be determined at trial but which cannot be compensated by money alone.

133.    Defendants' actions were committed knowingly, willfully, and in conscious disregard of ACT's rights. Accordingly, ACT is entitled to recover actual and punitive damages in an amount to be determined at trial, specifically but without limitation to the foregoing. ACT is entitled to recover the maximum amount provided for pursuant to the law.

### Count Three
Common Law Conversion Against All Defendants

134.    Plaintiff adopts and incorporates by reference all allegations set forth in the preceding paragraphs as if completely and fully set forth herein.

135.    ACT has ownership of and the right of immediate possession to ACT's property.

136.    Defendants have knowingly exercised dominion, control, and/or ownership over ACT's property through their actions, as described in this Complaint.

137.    Defendants still have wrongful possession, dominion, and control over ACT's property.

138.    The property over which Defendants have exercised dominion and control belong to ACT and is in the possession of Defendants without authorization from ACT.

139.    As of the date of this Complaint, Defendants have failed to return ACT's property to ACT, or in any way allow ACT to exercise its exclusive right to dominion and control of such proprietary and confidential property.

140.    As a direct result of Defendants' wrongdoing, ACT has been damaged in an amount to be determined at trial but which cannot be compensated by money alone.

### COUNT FOUR
Violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, *et. seq.*

Against Defendant Steven Iverson

141.   Plaintiff adopts and incorporates by reference all allegations set forth in the preceding paragraphs as if completely and fully set forth herein.

142.   ACT's computers are involved in interstate and foreign commerce and communication, and are protected computers under 18 U.S.C. § 1030(e)(2).

143.   Defendant Steven Iverson knowingly and intentionally accessed ACT's computers without authorization and/or in excess of the authorization granted to him by ACT.

144.   Steven Iverson removed and deleted confidential and valuable ACT information from ACT's computers without authorization and in excess of any authorization granted to him by ACT. This information included, but was not limited to, confidential customer information and customer lists, vendor lists and information, price lists and invoices, engineering information, blueprints and drawings, and product specifications and ACT account credentials to which he was not permitted access.

145.   Defendant Steven Iverson knowingly, willfully, and with an intent to defraud, accessed ACT's computers without authorization and in excess of authorization in order to compete with ACT. Upon information and belief, Defendant Steven Iverson took such actions for his own benefit and to the detriment of ACT.

146.   Defendant Steven Iverson has caused a loss to ACT in excess of $5,000.00 during a 12-month period.

147.   ACT has been damaged by Defendant Steven Iverson's actions and is being forced to expend resources to investigate the unauthorized access and abuse of its computer

equipment. ACT seek compensatory and other equitable relief under 18 U.S.C. § 1030(g) in an amount to be proven at trial.

148.    ACT has suffered significant, irreparable and incalculable harm and injuries resulting from Defendant Steven Iverson's conduct, which harm will continue unless he is required to return ACT information and is properly enjoined from further use of ACT's confidential information to wrongfully harm ACT's competitive advantage in the marketplace and to harm ACT's client relationships. ACT has no adequate remedy at law.

## COUNT FIVE
### Conspiracy Against All Defendants

149.    Plaintiff adopts and incorporates by reference the allegations set forth in the preceding paragraphs above as if completely and fully set forth herein.

150.    Defendants have perpetrated a conspiracy to wrongfully and unlawfully harm ACT by, among other things, exposing ACT's trade secrets and confidential and proprietary information and by stealing and converting ACT's property.

151.    ACT has alleged that, as part of this conspiracy, Defendants have committed the wrongful actions and torts discussed herein.

152.    Defendants entered into an agreement to conspire against ACT with the object of harming ACT to its clients and vendors and to benefit ACT's competitors by providing ACT's competitors with ACT's most valuable information and materials.

153.    As alleged throughout this Complaint, Defendants have committed numerous overt acts in furtherance of this conspiracy (including in Minnesota), including but not limited to: (1) the removal of ACT's confidential and proprietary information and trade

secrets from ACT's computers; (2) threatening the exposure of ACT's confidential and proprietary information contrary to ACT's authorization; (3) the theft of ACT's property and materials; (4) wrongfully transferring via electronic means ACT's property and information via email and other electronic means to unauthorized persons; (5) wrongful possession of ACT's property and materials in contravention of ACT's authorization; and (6) the wrongful acquisition of ACT's confidential and proprietary engineering data and client information.

154.    Defendants' participation in the above overt acts, in furtherance of the conspiracy, was intentional, knowing, willful, and with the purpose of causing harm to ACT.

155.    As a direct result of Defendants' wrongdoing, ACT has been damaged in an amount to be determined at trial, but which cannot be compensated by money alone.

156.    Defendants' actions were committed knowingly, willfully, and in conscious disregard of ACT's rights. Accordingly, ACT is entitled to recover actual and other damages in an amount to be determined at trial.

## COUNT SIX
Civil Action Pursuant to Minn. Stat. § 609.53

157.    Plaintiff adopts and incorporates by reference the allegations set forth in the preceding paragraphs above as if completely and fully set forth herein.

158.    All Defendants have received and currently possess information and materials belonging to ACT, including but not limited to the ACT Trade Secrets.

159.    Defendant Steven Iverson wrongfully transferred ACT's property and materials, including but not limited to the ACT Trade Secrets, to the other Defendants.

160.    All Defendants know or have reason to know that the property that they possess and/or wrongfully transferred belongs exclusively to ACT and was obtained by wrongful means, up to and including theft.

161.    Because of the wrongful taking, transferring, and possessing of ACT materials, including but not limited to the ACT Trade Secrets, ACT has been injured.  ACT hereby requests all damages available to it under the law, up to and including treble damages and attorneys' fees, all of which is allowable by law.

## COUNT SEVEN
Breach of Confidentiality

162.    Plaintiff adopts and incorporates by reference the allegations set forth in the preceding paragraphs above as if completely and fully set forth herein.

163.    Defendant Steven Iverson held a senior management position for ACT.

164.    In this role, Defendant Steven Iverson was allowed access to and use of certain of the ACT Trade Secrets.

165.    Defendant Steven Iverson was granted authorization to use and access these ACT Trade Secrets for the sole purpose of conducting his duties for ACT. Any use outside of this authorization was wrongful.

166.    The ACT Trade Secrets belong exclusively to ACT and no rights or interests to the ACT Trade Secrets belong to any Defendants in this action.

167.    All of the ACT Trade Secrets are considered confidential and ACT takes great measures to protect the confidentiality of the ACT Trade Secrets.

168.    Upon the termination of the relationship between Defendant Steven Iverson and ACT, Defendant Steven Iverson was required to relinquish possession of the ACT Trade Secrets.

169.    Defendant Steven Iverson had no authority to use, access, or possess the ACT Trade Secrets after the relationship terminated.

170.    The relationship between the parties terminated.

171.    Defendant Steven Iverson has refused to relinquish control of the ACT Trade Secrets and still wrongfully and knowingly possesses them.

172.    Defendant Steven Iverson, during his relationship with ACT, transmitted the ACT Trade Secrets to Defendant John Iverson and to Defendant Elite IBS (and Elite Industrial Business Solutions).

173.    Defendant Steven Iverson was not authorized to transmit the ACT Trade Secrets to either of the other Defendants.

174.    No Defendants have authorization to possess the ACT Trade Secrets.

175.    Defendants are now using the ACT Trade Secrets to extort money from ACT and to threaten ACT's business.

176.    Because of these wrongful actions of Defendants, ACT has been damaged in an amount to be proven at trial.

## COUNT EIGHT
Preliminary and Permanent Injunction Against All Defendants

177.    Plaintiff adopts and incorporates by reference the allegations set forth in the preceding paragraphs above as if completely and fully set forth herein.

178.    ACT is highly likely to succeed on its claims that Defendants are using ACT's confidential and proprietary information to unfairly harm and damage ACT, including to allow ACT's competitors to wrongfully compete against ACT.

179.    The misappropriation and use of ACT's confidential and proprietary information to unfairly and unlawfully compete with ACT constitutes irreparable harm.

180.    The balance of equities favors ACT. Defendant Steven Iverson has taken and Defendants John Iverson and Elite IBS, LLC wrongfully possess, ACT's confidential and proprietary information, trade secrets, property, and materials, for Defendants' benefit and to the detriment of ACT.

181.    If Defendants are allowed to continue these breaches and do not return ACT's stolen trade secrets and confidential and proprietary information, ACT will continue to suffer irreparable harm.

182.    ACT has no adequate remedy at law.

183.    The injunction will preserve the status quo by preventing Defendants from using ACT's confidential information and trade secrets to harm ACT and harm ACT's competitive advantage in the marketplace, pending the outcome of the trial on the merits.

184.    The public interest would not be disserved by the issuance of a permanent injunction in these circumstances.

185.    ACT is entitled to a preliminary and permanent injunction (1) enjoining Defendants from continuing to use and possess ACT's confidential and proprietary information and trade secrets; (2) requiring Defendants to return all confidential and trade secret information belonging to ACT; (3) ordering Defendants to submit all electronic devices in their possession and control for forensic imaging, at Defendants' expense, including the permanent removal of all ACT trade secret and confidential information from the devices; (4) ordering Defendants to submit all email accounts in their possession and control to forensic imaging and for the permanent removal of all ACT trade secret and confidential information from those accounts; and (5) enjoining Defendants from improperly, through the use of any means, from interfering with ACT's business relationship with its customers, supplies, vendors, or any other business relationship.

## RESERVATION OF RIGHTS

1.    Act hereby reserves the right to claim punitive damages pursuant to Minn. Stat. §§ 549.191, 549.20, and other applicable law, by way of an amended complaint as contemplated by Minn. Stat. § 541.191.

2.    Notwithstanding this reservation of rights to claim punitive damages by way of an amended complaint, ACT's initial Complaint correctly seeks punitive damages as a

matter of right in connection with Defendants' violation of Minn. Stat. § 604.14. (*See, e.g., OnePoint Solutions, LLC v. Borchert*, 486 F.3d 342, 348 (8th Cir.) ("Minnesota case law…holds that it is not necessary for a plaintiff to receive permission from the trial court to amend its complaint to seek punitive damages when the remedy is sought under § 604.14.").

## JURY DEMAND

1.      ACT hereby demands a jury trial on all claims so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands relief in its favor and against all Defendants jointly and severally as follows:

(a)     An award of damages to Plaintiff in an amount to be proven at trial, of at least $1,000,000.00, caused by the Defendants' violations of the Defend Trade Secrets Act, the Computer Fraud and Abuse Act, and Minnesota Civil Theft laws (*i.e.*, Minn. Stat. § 604.14 and Minn. Stat. § 609.53), as well as their liability for common law conversion, conspiracy, and breach of confidentiality;

(b)     A preliminary and permanent injunction: (1) enjoining Defendants from continuing to use and/or possess any of ACT's confidential and proprietary information and trade secrets; (2) requiring Defendants to return all confidential and trade secret information belonging to ACT; (3) ordering Defendants to submit all electronic devices in their possession and control for forensic imaging, at Defendants' expense, including the permanent removal of all ACT trade secret and confidential information from the devices; (4)

ordering Defendants to submit all email accounts in their possession and control to forensic imaging and for the permanent removal of all ACT trade secret and confidential information from those accounts; and (5) enjoining Defendants from improperly, through the use of any means, interfering with ACT's business relationship with its customers, supplies, vendors, or any other business relationship;

(c)     Because of Defendants' willful and malicious actions, exemplary damages as pled herein;

(d)     Interest, cost, expenses, and attorneys' fees;

(e)     All statutory damages to which Plaintiff is entitled as a result of Defendants' civil theft; and

(f)     Any other relief the Court finds just and proper.


Dated: June 19, 2019                    Respectfully submitted,

**BOWMAN AND BROOKE LLP**

/s/ *Charles (C.J.) Schoenwetter*
Charles (C.J.) Schoenwetter (#025115X)
150 South Fifth Street, Suite 3000
Minneapolis, MN  55402
Tel: (612) 339-8682
Fax: (612) 672-3200
cj.schoenwetter@bowmanandbrooke.com

**ATTORNEYS FOR PLAINTIFF**
**ADVANCED CONTROL TECHNOLOGY,**
**INC.**